Thomas **KRESNAK** and Ronald **Rake**, Plaintiffs,

v.

**CITY OF MUSKEGON HEIGHTS,** Defendant.

No. 1:95–CV–400.

United States District Court, W.D. Michigan Southern Division.

Jan. 22, 1997.

Thomas Vander Hulst, Visser & Bolhouse, P.C., Grandville, MI, for plaintiffs.

Susan Klooz, Plunkett & Cooney, P.C., Grand Rapids, MI, for defendant.

## OPINION

QUIST, District Judge.

This is an employment discrimination case. Plaintiffs, Ronald Rake and Thomas Kresnak, are white police officers for the City of Muskegon Heights, Michigan. They claim that they were not promoted from patrol officer to sergeant because of their race. Plaintiffs have asserted claims under 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VII, 42 U.S.C. § 2000e, and Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101. The case was tried before a jury for seven days. At the conclusion of Plaintiffs' case and again at the conclusion of all of the proofs, the City moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50. This Court partially granted and partially denied the City's motion, and reserved its

decision on other aspects of the motion. Answering specific questions, the jury returned a verdict for each Plaintiff. Verdicts are attached.

### Legal Standard

This Opinion now addresses parts of the motion upon which this Court reserved its decision. Fed.R.Civ.P. 50(b). A motion under Rule 50 can be granted only if the evidence presented, viewed in the light most favorable to plaintiffs makes it clear "that reasonable people could come to but one conclusion," that is, if there is no legally sufficient basis for a verdict in favor of plaintiffs. *Hill v. McIntyre*, 884 F.2d 271, 274 (6th Cir.1989) (citing *Coffy v. Multi–County Narcotics Bureau*, 600 F.2d 570, 579 (6th Cir.1979)). As the Supreme Court has made clear, the test for judgment as a matter of law pursuant to Rule 50 is essentially the same as that for summary judgment, i.e., "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### Facts

The City of Muskegon Heights, Michigan, encompasses about four square miles just south of the larger City of Muskegon. Muskegon Heights has approximately 13,000 residents, the majority of whom are African Americans ("blacks"). The Mayor is black, the current City Manager is black, the City Council is comprised of all or almost all black members. The Mayor of the City testified that 98% of the high school students are black. The only particular relevance of this information is that under these circumstances the question is raised of whether this is a case of "reverse race discrimination."[1]

---

1. This could be an important question because in a reverse discrimination case the Sixth Circuit puts a higher threshold of proof upon a white plaintiff than upon a plaintiff who belongs to a racial minority. The plaintiff must show that " 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.' " *Boger v. Wayne County*, 950 F.2d 316, 325 (6th Cir.

1991) (citation omitted). *But cf. Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n. 7 (6th Cir.1994) (stating "serious misgivings" about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male). The problem with placing a heavier burden upon the officers in this case is that in the City of Muskegon Heights these Plaintiffs are of the minority race. Therefore, this

Plaintiffs' theory of liability is that the City of Muskegon Heights informally established a policy, custom, or usage whereby no white patrol officer would be promoted to sergeant until a black officer was promoted to sergeant. There is no evidence of any vote establishing such a policy and there is no evidence of a surreptitious or any other informal meeting of City officials establishing such a policy.

### Statute of Limitations

Plaintiffs claim that the acts of the City show a continuing violation of various statutes, dating back to the time Rake was first denied a promotion to sergeant. The City, on the other hand, claims that all applicable statutes of limitations started to run the first time that Plaintiffs had knowledge of a discriminatory policy and that Plaintiffs would have such knowledge the first time that they suffered discrimination. The City claims that since Rake alleges incidents of discrimination against him since at least 1988, Rake cannot recover at all because his claims are all barred by every applicable statute of limitations.

At the conclusion of Plaintiffs' case on liability, this Court, in response to the City's Rule 50 motion, ruled that Plaintiffs would have no claim for any failure to promote which occurred prior to June 16, 1992, which date was three years prior to this case having been filed. The rationale for this decision was that Plaintiffs were asserting claims under several statutes, and three of those statutes, 42 U.S.C. §§ 1981 and 1983, and Michigan's Elliott–Larsen Civil Rights Act, have three-year statutes of limitations. This Court held that neither the Plaintiffs nor the City was correct in their arguments regarding the statute of limitations. The facts of this case do not present a pure continuing violation and do not present the mere delayed and inevitable effect or impact of a facially neutral discriminatory policy.

■ The case continued after this ruling without this Court having decided whether any claim, or portion thereof, was barred by the separate statute of limitations contained in Title VII. A separate ruling on that issue is unnecessary.[2] Plaintiffs' administrative

---

Court will not put any heavier burden of proof upon Plaintiffs than it would put upon a black officer in a city where blacks are the minority. *But see Boggs v. Commonwealth of Ky.*, No. 95–6452, 1996 WL 673492, at \*3 (6th Cir. Nov. 20, 1996) (applying higher standard on white police officer who worked for a traditionally black institution).

**2.** The City argued that Title VII is Plaintiffs' exclusive remedy for a discriminatory refusal to promote. The City then argued that, once the Title VII claims are dismissed because of the statute of limitations, all of Plaintiffs' federal claims must be dismissed. This Court has already rejected this argument in its rulings on the City's motion for summary judgment and for judgment as a matter of law pursuant to Rule 50. This Court said that Title VII does not provide an exclusive remedy except in those cases where Title VII creates a new remedy, such as in cases of retaliation or harassment. 42 U.S.C. §§ 1981 and 1983, and the Elliott–Larsen Civil Rights Act provide additional remedies for claims of disparate treatment. *See, e.g., Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (the fact that a statute contains a comprehensive remedial scheme does not necessarily rule out the availability of all additional remedies under § 1983). There are numerous cases which have sustained claims of employment discrimination pursuant to 42 U.S.C. §§ 1981 and 1983.

The timely filing of a charge of discrimination with the EEOC and the subsequent timely filing of a complaint in federal district court are prerequisites to maintenance of a Title VII action. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 1887 n. 4, 52 L.Ed.2d 571 (1977) (finding that timely filing is a prerequisite to maintaining a Title VII action). 42 U.S.C.A. § 2000e–5(e), as amended by § 2000e–5(e)(1), provides in part:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier. . . .

Pursuant to this statute, Plaintiffs were required to file a discrimination claim with the EEOC within three hundred days after the alleged unlawful employment practice occurred. The City contends that Plaintiffs' failure to file an administrative charge with the EEOC until May 30, 1995, prevents Plaintiffs from challenging any allegedly discriminatory practice which occurred prior to August 2, 1994. The City argues

charges were filed on May 30, 1995. This case was filed on June 16, 1995. Therefore, the three-year "look back" period under Sections 1981, 1983 and the Elliott–Larsen Act would encompass any Title VII claim for the same allegedly wrongful act of the City.

The continuing violation theory urged by Plaintiffs was set forth by the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens*, the Court held that discriminatory conduct that occurs beyond the limitations period is actionable "[w]here a plaintiff ... challenges not just one incident of [unlawful] conduct ... but an unlawful practice that continues into the limitations period." *Havens*, 455 U.S. at 365, 102 S.Ct. at 1117. Where there is a discriminatory course of conduct, the conduct may be challenged in its entirety, provided one of those discriminatory acts falls within the limitations period. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 511 (6th Cir.1991).

■ The Sixth Circuit has held that the continuing violation theory is a narrowly limited exception to the usual rule that statutes of limitations are triggered when the alleged discriminatory act occurred. *Haithcock v. Frank*, 958 F.2d 671, 677–78 (6th Cir.1992) (citing *Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir.1991)). There are two categories of continuing violations in discrimination cases. The first category arises:

"where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation; that is,

where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups." *Haithcock*, 958 F.2d at 678 (quoting *Dixon*, 928 F.2d at 216). As to the first category, at least one discriminatory act must have occurred within the relevant statutory period. *Id.* (citing *Dixon*, 928 F.2d at 216). The second category of continuing violation arises when there is "a longstanding and demonstrable policy of discrimination." *Id.* (quoting *Dixon*, 928 F.2d at 217). Unrelated incidents of discrimination are not sufficient to invoke this exception; there must be an "overarching" policy of discrimination. *Haithcock*, 958 F.2d at 678 (citing *Dixon*, 928 F.2d at 217).

Plaintiffs assert that the City's refusal to promote them constitutes the second type of continuing violation—the overarching policy of discrimination.

The United States Supreme Court has held that while a continuing violation is actionable, the continuing effect or impact of a past violation is not actionable. In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), which is relied upon by the City, the Court held that the denial of tenure, as distinguished from the employee's discharge, started the limitations period to run:

It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure. *Id.* at 257–58, 101 S.Ct. at 504. The Court determined that Ricks' allegation that the discharge perpetuated the consequences of

---

that the alleged discrimination regarding the education requirement in the collective bargaining agreement occurred when the collective bargaining agreement containing the change in the promotional procedure was signed on August 23, 1993, and not when George Hubbard, a black police officer, was promoted on April 13, 1995. The City claims that any disqualification of Rake because of the allegedly unilateral imposition of the associate's degree requirement was the inevitable *effect* of the change in the promotional policy.

This Court agrees with the City insofar as the argument refers to the adoption of the education requirements. The adoption of the education requirement was facially neutral and carried a known and inevitable consequence from the date of its adoption, or at least from the date that

notice of the sergeant's exam was posted after the adoption, on April 14, 1994. The new education requirement immediately prevented patrol officers who did not have the education from taking the sergeant's exam. Neither Rake nor Kresnak had to wait to see if they were affected by this provision in the collective bargaining agreement. They were immediately affected in that they immediately became ineligible to take the exam. Thus, claims under Title VII that the education requirement was discriminatory are barred by the statute of limitations.

Likewise, Plaintiff Kresnak's claim that he was not promoted in July 1992, because of his race is barred by Title VII's statute of limitations. Kresnak knew then that he would not receive the sergeant position, and he believed that he would not receive this position because of his race.

the discriminatory denial of tenure and consequently prolonged the cause of action was unfounded:

> The emphasis is not upon the effects of earlier employment decisions; rather, it "is [upon] whether any present violation exists."

*Id.* (citations omitted). *Ricks* is distinguishable, however, from the instant case because it involved a single act of discrimination directed at a specific individual, the allegedly discriminatory decision had a known and inevitable consequence, and the alleged discrimination resulted in a termination.

In *Lorance v. AT & T Techs., Inc.*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), which is also relied upon by the City, female employees at an electronics plant challenged the plant's modified seniority system[3] as having had an adverse impact upon women. The Supreme Court rejected the plaintiffs' characterization of the modified seniority system as a continuing violation, stating that "when a seniority system is nondiscriminatory in form and application, it is the allegedly discriminatory *adoption* which triggers the limitations period." *Id.* at 911, 109 S.Ct. at 2268–69. The Court held that a demotion because of the change in the seniority system merely gave present effect to a past act of discrimination and was not a continuing violation itself. *Id.* at 908–09, 109 S.Ct. at 2267. *Lorance* is distinguishable from the instant case because it involves a single, announced, neutral seniority policy, the effects of which were felt later. In other words, the adoption of the new seniority system was the sole discriminatory act which started the limitation periods running, and later injuries suffered because of the operation of the neutral plan merely gave present effect to a past act of discrimination.

The case of *Roberts v. North American Rockwell Corp.*, 650 F.2d 823 (6th Cir.1981), involved allegations that the defendant refused to hire women. The plaintiff first could not obtain an application. Then, after she mailed the defendant employer a completed application, plaintiff did not receive a response, and was later told that she would not be hired because she was a woman. The Sixth Circuit stated that the complaint and limited record supported the plaintiff's contention "that she was subjected to an ongoing pattern of discrimination." *Id.* at 826. *Roberts* further stated that when a person is fired, as in *Ricks*, the discriminatory act takes place when the employee is fired.

> The issue becomes more difficult when a company fails to hire *or promote* someone because of their race or sex. In many such situations, the refusal to hire or promote results from an ongoing discriminatory policy which seeks to keep blacks or women in low-level positions or out of the company altogether. In such cases, courts do not hesitate to apply what has been termed the continuing violation doctrine.

*Id.* (emphasis added). An employer continually violates Title VII "so long as its discriminatory policy remains in effect." *Id.* at 827. The court, in *Roberts*, said that the plaintiff's charge was timely for two alternative reasons: 1) the violation was continuing; and 2) a discriminatory act occurred within the statutory period. *Id.* at 827–28.[4]

*Roberts* is not a recent case, but its holding was recently upheld in *Middleton v. City of*

---

**3.** This Court notes that the Civil Rights Act of 1991 was intended to change the rule announced in *Lorance* that Title VII plaintiffs may be required to challenge a seniority system upon its adoption. Congress was apparently concerned that this type of rule could require an employee to bring an employment discrimination charge even before he had reason to believe the practice might injure him. H.R.Rep. No. 102–40 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 598–99. The provisions of 42 U.S.C. § 2000e–5(e)(2) which apply to seniority systems are not on point with the case at bar. This is not to suggest that the Supreme Court's language in *Lorance* is not useful. The *Lorance* decision applies the traditional distinction between the present effects of a past violation and the continuation of the violation into the present.

**4.** Likewise, in *Green v. Los Angeles County Superintendent of Sch.*, 883 F.2d 1472 (9th Cir.1989), the court stated that a "systematic" policy of discrimination is actionable even if some of the events occurred prior to the limitations period because the continuing system operates against the employee and violates his rights up to a time within the limitations period. *Id.* at 1480. "Such continuing violations are most likely to occur in the matter of placements *or promotions.*" *Id.* (emphasis added).

*Flint,* 92 F.3d 396 (6th Cir.1996). In *Middleton,* the Sixth Circuit held that the limitations period did not start to run when an affirmative action plan was adopted. *Id.* at 401 n. 4. Rather, the statute started to run when the person was denied promotion and "thereby received notice of the allegedly discriminatory conduct." *Id.* The Court then went on to explain that, unlike a seniority system, by which the employees' rights and interests are immediately altered, an affirmative action plan for hiring and promotions does not, itself, alter an employee's status. *Id.* The Court said "a continuing violation occurs *each* subsequent time an applicant is wrongly subjected to an adverse employment decision." *Id.* (emphasis added).

Upon a casual reading, *Roberts* might lead a person to conclude that any failure to promote is a continuing violation which keeps the statute of limitations period open until the promotion occurs. But any determination of whether employment discrimination is continuing or is a specific identifiable act with delayed consequences as in *Ricks* and *Lorance,* requires the court "to identify precisely the 'unlawful employment practice' of which (the plaintiff) complains." *Ricks,* 449 U.S. at 257, 101 S.Ct. at 503.

The problem with finding a "continuing violation," as Plaintiffs propose in the instant case, is that, unlike *Roberts,* for example, there is no evidence that the City had an overarching policy of refusing to promote any white patrol officer until a black patrol officer is promoted. Rather, Plaintiffs wish to show a continuing violation by stitching together evidence of a series of unrelated, individual, discrete acts of alleged discrimination. This Court finds these acts caused discrete diminutions in Rake's employment prior to June 16, 1992. Rake applied for a sergeant's position in 1988 and 1991. He was temporarily promoted in 1989, but that promotion was rescinded. He was not promoted in 1991, because of questions regarding residency. The point is, that these were specific acts on the part of the City. Rake knew in 1989 and in 1991 that he was not being promoted, and he believed at each of these times that he was not being promoted because of his race. As held in *Haithcock,*

unrelated incidents are not sufficient to invoke the continuing violation exception. *Haithcock,* 958 F.2d at 678.

At the same time, however, Rake is not barred from filing timely claims when he suffers a new and unrelated diminution (or injury) in employment which is not the mere effect of a prior diminution. Unlike *Ricks* and *Lorance,* there was no specific policy given to Rake, not even a policy as clear as the affirmative action plan in *Middleton,* which Rake could have challenged or which Rake knew would be applied in the future. Rake was not simply awaiting the "delayed, but inevitable" consequence of the City's discriminatory policy. Rather, the alleged policy of the City was one of presenting new obstacles as time went on—i.e., referral to the personnel committee, a written commitment to residency, failure to promote at specific times, contractual education requirement. Merely because an employee does not file a charge or claim the first time an employer discriminates does not forever immunize the employer against claims of discrimination in employment. But the new and unrelated diminution does not resurrect old, unrelated claims of discrimination which were previously barred by the statutes of limitations. The new, unrelated claim is just that—a new claim which starts the statute running on the new claim only.

This Court's ruling is best captured in the leading case of *Dixon v. Anderson,* 928 F.2d 212 (6th Cir.1991):

The second category of "continuing violation" arises where there has occurred "a longstanding and demonstrable policy of discrimination." Unrelated incidents of discrimination will not suffice to invoke this exception; rather, there must be a continuing "over-arching policy of discrimination." Generally, "[r]epeated requests for further relief from a prior act of discrimination will not set the time limitations running anew." However, where there has been a long-standing policy of discrimination, *repeated* attempts to gain employment or promotions may *each* trigger the running of a *new* limitations period. (Citing *Roberts.*)

*Id.* at 217 (underlining added) (citation omitted). Furthermore:

Each plaintiff's cause of action accrued when he had reason to know of his injury. *Id.* at 219.

For these reasons, Plaintiff Rake's claims that the City is liable to him under Sections 1981 and 1983 and the Elliott–Larsen Civil Rights Act, for alleged discrimination prior to June 16, 1992, are barred by the statute of limitations. As stated, these claims related to specific known, unrelated, discrete acts which Rake, at the time they occurred, believed were discriminatory. As such, these claims were dismissed during the course of trial. New and discriminatory acts occurring after June 16, 1992, are not barred under the three-year statute of limitations.

### *42 U.S.C. §§ 1981 and 1983; Michigan Elliott–Larsen Civil Rights Act*

Because of this Court's rulings on the statutes of limitations, the Court must still decide whether Plaintiffs have shown evidence of discriminatory acts after June 16, 1992, up to the time that they were promoted to sergeant—January 28, 1996 for Rake and May 12, 1996 for Kresnak.

The analysis under Fed.R.Civ.P. 50 and 56 of whether a case should be submitted to the jury is the same under Sections 1981, 1983 and the Elliott–Larsen Civil Rights Act as it is under Title VII. *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 202 (6th Cir. 1993) (Section 1983); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (Section 1981); *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 617 (6th Cir.1986) (Elliott–Larsen); *Daniels v. Board of Ed.*, 805 F.2d 203, 207 (6th Cir.1986) (Sections 1981 and 1983).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court set forth the elements of a prima facie case of racial discrimination by

circumstantial evidence: (1) plaintiff is a member of a protected class, (2) he was qualified for the position, (3) he was not promoted, and (4) the position was ultimately filled by a person not of the protected class or the position remained open. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254 n. 6, 101 S.Ct. at 1094 n. 6.

A plaintiff can satisfy the fourth element of the *McDonnell Douglas* formulation by showing either that a black person was promoted in place of plaintiff or that similarly situated black employees were treated more favorably than plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. *But cf. Talley v. Bravo Pitino Restaurant, Inc.*, 61 F.3d 1241, 1247 (6th Cir.1995) (finding that the fourth element of the *McDonnell Douglas* formulation may be satisfied "by showing either that the plaintiff was replaced by a person outside the protected class or that similarly situated non-protected employees were treated more favorably than the plaintiff"). In order to show that he was "similarly situated" to a black patrol officer a "plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [black] employees who he alleges were treated more favorably." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994). *See also Mitchell*, 964 F.2d at 583. "The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." *Pierce*, 40 F.3d at 802.[5]

The *McDonnell Douglas* formulation for establishing a prima facie case of unlawful discrimination is inapplicable to cases in which the plaintiff presents credible, direct evidence of discriminatory animus. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir.1993) (*LaPointe I*) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985)); *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114–15 (6th Cir.1987)

---

5. The *McDonnell Douglas* formulation of a prima facie case is not the only formulation because no single formulation may fairly be expected to capture the many guises in which discrimination may appear. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

(citing *Trans World Airlines,* 469 U.S. at 121, 105 S.Ct. at 621). In the Sixth Circuit, "direct evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.' With direct evidence, the existence of unlawful discrimination is 'patent.'" *Bartlik v. United States Dep't of Labor,* 73 F.3d 100, 103 n. 5 (6th Cir.1996) (citation omitted). "Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985).

Direct evidence of discrimination may consist of statements made by a decision maker which show an illegal motive for employment decisions. For example, negative statements regarding older workers repeatedly made by members of a decision maker's union caucus and the decision maker are sufficient direct evidence of an illegal motive for the decision so as to establish a prima facie case. *LaPointe I,* 8 F.3d at 380. Evidence of racial slurs by a manager constitutes direct evidence of racial discrimination "sufficient to get the plaintiff's case to the jury." *Talley,* 61 F.3d at 1249 (citing *Miles v. M.N.C. Corp.,* 750 F.2d 867, 870 (11th Cir.1985)). Statements to an applicant that a county would not hire a female Emergency Medical Technician coupled with the employer losing an application, has been held direct evidence of discrimination. *Terbovitz,* 825 F.2d at 113. On the other hand, "'isolated and ambiguous statements ... are too abstract, in addition to being irrelevant and prejudicial, to support a finding of ... discrimination.'" *LaPointe I,* 8 F.3d at 380 (quoting *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989)). Also, threats and intimidation by a person who is not in a position to make the relevant employment decision is not direct

evidence of discrimination. *LaPointe v. United Autoworkers Local 600,* 103 F.3d 485 (6th Cir.1996) (*LaPointe II* ).

Once a prima facie case is established, either by circumstantial or direct evidence, the employer can rebut the presumption of unlawful discrimination by setting forth "reasons for its actions which, if believed by the trier of · fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). In a case of circumstantial evidence, nothing more is required of the employer than simply explaining what it has done or producing evidence of legitimate nondiscriminatory reasons. *Board of Trustees,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978).[6]

In a circumstantial case, once the employer articulates its nondiscriminatory reasons for the employment decision, the burden shifts back to the plaintiff to show that the articulated reasons for the decision were mere pretexts. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. Three methods exist to prove pretext: 1) the stated reasons have no basis in fact; 2) the stated reasons were not the actual reasons; or 3) the stated reasons were insufficient to explain the employer's actions. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994) (citing *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir.1983)); *Wheeler v. McKinley Enters.,* 937 F.2d 1158, 1162 (6th Cir.1991) (citing *Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 265 (6th Cir.1986)). The district court facing a Rule 50 motion has the obligation to review the adequacy of the showing presented to the factfinder. *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1072 (3rd Cir.1996). "The district court must determine whether the plaintiff

---

6. In *Terbovitz,* the Sixth Circuit said that where the plaintiff has presented *direct* evidence of discrimination the employer must do more than merely articulate its nondiscriminatory motive— it must assert the nondiscriminatory motive as an affirmative defense upon which it bears the burden of proof. *Id.* at 115. This Court believes that the continuing validity of this statement in *Terbovitz* is doubtful in light of *St. Mary's Honor,* which holds that rejection of the employee's prof-

fered reasons for its actions does not require a finding of unlawful discrimination because the ultimate burden of proof always rests upon the plaintiff. *St. Mary's Honor,* 509 U.S. at 507, 113 S.Ct. at 2747. *See also Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 883 (6th Cir. 1996) (finding that plaintiff always bears the ultimate burden of persuading the trier of fact that illegal discrimination took place).

has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible." *Id.*

The question arises, as in the instant case, of whether there is a jury submissible issue when the plaintiff presents a prima facie case by circumstantial or direct evidence, the employer presents evidence of a non-discriminatory reason for its employment decision, and the plaintiff produces no evidence to rebut the non-discriminatory reason. The Sixth Circuit partially answered this question in a disability discrimination case:

> [I]f the defendant carries that burden of production, plaintiff must then prove "by a preponderance of the evidence" that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination. More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions.
>
> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action. At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place.

*Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 883 (6th Cir.1996) (citations omitted). As a matter of analysis and practical application, this Court believes that direct proof of racial discrimination sufficient to establish a prima facie case may also be the same proof that overcomes the employer's explanation. In other words, the direct proof of racial discrimination may constitute proof that the employer's proffered reason for the

employment decision is not the actual reason for the decision or is insufficient to explain the employer's action. *Talley,* 61 F.3d at 1248. Thus, the employer's arguments that a plaintiff did not establish a prima facie case and the employer's non-discriminating explanation often merge. They do in this case.

As stated in *Burdine* and *St. Mary's,* once the Court gets through the burden shifting analysis, the question boils down to whether Plaintiff has proved that the adverse employment decision was because of a prohibited motive. *See Burdine,* 450 U.S. at 259–60, 101 S.Ct. at 1097; *St. Mary's,* 509 U.S. at 514–15, 113 S.Ct. at 2751. Each plaintiff must show purposeful, intentional discrimination and prove that the adverse employment decisions would not have been made but for their race. *Boger v. Wayne County,* 950 F.2d 316, 324–25 (6th Cir.1991) (citing *Charles v. Baesler,* 910 F.2d 1349, 1356–57 (6th Cir.1990) and *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988)). A plaintiff always bears the burden of proof regarding this question.

### Analysis of Plaintiffs' Proofs [7]

The proofs upon which Plaintiffs rely upon to prove their case are as follows: [8]

- In 1983, Police Chief Howell told Police Sergeant Mike Whittiker that the City had affirmative action.

- From 1985 until there were several promotions in 1996, there was a need for additional sergeants on the police force.

- In 1985, two white patrol officers passed the sergeant's exam, but neither was promoted.

- In 1987, Rake and a black officer, John Scott, passed the sergeant's exam, and Scott was promoted.[9]

- In 1988, Rake and a black officer, George Hubbard, passed the exam.

**7.** The City's non-discriminatory reasons for the principal events occurring before June 16, 1992, are set forth in footnotes 8–12, 14.

**8.** A statute of limitations applies to *claims* of discrimination and not to *evidence* supporting the claims. *Black Law Enforcement Officers Ass'n v.*

*City of Akron,* 824 F.2d 475, 482–83 (6th Cir. 1987).

**9.** Rake, himself, testified that when he took the sergeant's exam in 1988, he thought that he was less qualified than Officer John Scott, a black who took the test and was promoted.

Chief Howell promoted Rake. In an unusual move, Rake's promotion was referred to the City Council's personnel committee, and Rake's promotion was rescinded. Hubbard was not promoted in Rake's stead.[10]

- In 1989, Police Chief Capehart tried to promote a black patrol officer, Latrice Sain, even though Sain had not passed the sergeant's exam. Sain's temporary promotion was rescinded.[11]

- In August 1991, the personnel committee recommended that Latrice Sain be promoted without having to take the sergeant's exam.[12]

- In September 1991, Rake was the only person to pass the sergeant's exam, but he was not promoted because he refused to tell Chief Capehart in writing that he would abide by the City's residency requirements. No other person was requested to make a written commitment prior to being allowed to take the oral boards to abide by the residency requirements.[13]

- In April 1992, Kresnak was allowed to take the sergeant's test, and he passed. Chief Capehart told Kresnak that he would be promoted to sergeant. Despite Chief Capehart's statement to the contrary, Kresnak ultimately was not

permitted to credit military police time to the five year experience requirement needed for promotion to sergeant. Kresnak determined that he was not being promoted in July 1992.

- In 1993, the City inserted a requirement into the patrol officers' collective bargaining agreement that in order to take the sergeant's exam the patrol officer must have an associates degree. This eliminated all but two black patrol officers from taking the sergeant's exam. Rake and Kresnak were also ineligible to take the sergeant's exam because they did not possess an associates degree. A black officer, George Hubbard, did qualify and pass the sergeant's exam. Hubbard was promoted on April 13, 1995, and the education requirement was immediately changed by a contract modification which said that officers with associates degrees would be preferred as distinguished from requiring the degree in order to take the exam.

- In 1993, Kresnak developed a canine program for the police department. Chief Capehart told another officer that Kresnak would be responsible for handling the dog. However, when the department obtained a dog, Kresnak

**10.** As its non-discriminatory reason for the rescission, the City called Mayor Robert Warren, who testified that this attempt to promote Rake occurred the last day that Howell was Chief. Warren said that Howell had been told not to appoint anyone so that the new Chief would have the opportunity to pick his own staff. Therefore, the promotion of Rake to sergeant violated the instructions given to the outgoing Chief. Plaintiffs failed to present any evidence to show that this explanation was a pretext. Also, the black officer, Hubbard, did not receive the promotions either. Thus, Rake cannot point to a "nearly identical" black officer who received favorable treatment on this occasion.

**11.** Latrice Sain was not promoted until May 1996.

**12.** Latrice Sain was not promoted until May 1996, after having taken and passed the exam.

**13.** Rake lived outside of the City, and pursuant to a City ordinance and the Command Officer's (including sergeant's) collective bargaining

agreement, he would have to move into the City after the completion of his probationary period as sergeant. Chief Capehart requested written confirmation that Rake would comply with the law before he convened the people for the oral board. He did not ask Rake to move into the City before becoming a sergeant or before completing his probationary period. The Chief requested Rake to inform the Chief in writing "whether or not you are willing to become a resident of the City of Muskegon Heights, in accordance with City Ordinance No. 359 and the Union Contract." Rake responded: "As I indicated in my letter 10/15/91 I do not intend to move anywhere for any reason, please indicate whether this eliminates me for consideration to this position." Chief Capehart responded that Rake had eliminated himself. The lack of any discriminatory motive of Chief Capehart is further shown by Rake's testimony that the Chief told Rake, in effect, "Lie to me (about your intent to move into the City)." This was improper, but it does show the Chief's desire to overcome what appeared to be a major hurdle in Rake's being promoted to sergeant—Rake's commitment that he would move into the City.

was not permitted to handle it. A black officer was given control of the dog. This black officer failed in his handling of the dog. The dog handling was eventually given to another white officer. A black officer, Mel Jordan, testified that he was told by Chief Capehart that the City Council did not want a white police officer handling the dog.[14]

- In 1993, Chief Capehart told Kresnak that two members of the City's personnel committee, Rullistine Wilkins and Pat Jones, told him that no white officer would become a sergeant unless and until Latrice Sain, a black, became a sergeant.

- Black officers were permitted to review their tests after failing the tests.[15]

- In May 1996, when Kresnak was promoted to sergeant, the four promoted officers were told that seniority would be granted in the same relative order of the test scores. When the promotions were actually granted, a black officer with a lower score was given more seniority than Kresnak. The issue of seniority for the four officers promoted on May 12, 1996, has not yet been resolved between the City and the officers.

■ Plaintiffs claim that their cases consist of direct and circumstantial proof of discrimination. The City claims that Rake and Kresnak were not qualified for the job from July 1, 1992 through June 30, 1995, because they did not have the associates degree which was a condition precedent for taking the sergeant's exam. The City also claims that Kresnak was not qualified to become a sergeant until July 1, 1995, because until that date Kresnak did not have five years' experi-

ence with a "police department," which also was a requirement for taking the sergeant's exam. Thus, the City claims that Rake and Kresnak have failed to establish a prima facie case and, furthermore, lack standing on the grounds that they did not suffer any "injury-in-fact."

This Court rejects the City's arguments because they ignore Plaintiffs' principal points—that the very requirements that prevent Plaintiffs from being qualified were themselves imposed with a discriminatory animus. This Court refuses to assume that these requirements were imposed without any discriminatory animus. In *Brunet v. City of Columbus*, 1 F.3d 390 (6th Cir.1993), the Court held that all a plaintiff need show in order to have standing is that but for the discriminatory program he would have been considered for the job. *Id.* at 397. The Court will analyze each allegedly discriminatory act and the City's justification for it under the principles set forth on pages 13 through 19 of this Opinion.

### Ronald Rake

■ The verdict form regarding Rake asked two initial questions: whether, after June 16, 1992, Rake's race was a motivating factor in his not being promoted sooner than he was; and whether, after June 16, 1992, Rake's race was the reason Rake was not allowed to take the sergeant's exam in 1992. The jury answered the first question "No", and it answered the second question "Yes." Thus, the sole question regarding Rake is whether there was a jury submissible issue on whether race was the City's motivating factor in denying Rake an opportunity to take a sergeant's exam after June 16, 1992. This question then becomes whether the insertion of the associates degree requirement

---

**14.** During the trial, the City objected to statements of Chief Capehart made to officers such as Officers Leonard and Kresnak. The City claims that these statements were hearsay. The Court allowed these statements into evidence on the ground that they showed the state of mind of Chief Capehart and were admissions against the City's interest. The Chief had the apparent authority under the patrol officers' collective bargaining agreements to promote qualified people to sergeant if there was an opening. Whether or not someone actually told Chief Capehart what

the Chief reported was not so important as the fact that the Chief was stating reasons for acting as he did. *See Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 693 (6th Cir.1979) (finding very probative *contemporaneous* statements made by persons in positions to know the purpose behind a department's traditional practices).

**15.** The test givers encouraged all those who failed to review their tests.

into the collective bargaining agreement effective from July 1, 1992 through June 30, 1995, was motivated by race, designed to narrow those eligible to take the sergeant's exam to two black officers.[16] Plaintiffs also argued that the educational requirement was inserted without the knowledge of the members of the patrol officers' bargaining unit.

In an effort to show a non-discriminatory motive for inserting the education requirement into the patrol officers' collective bargaining agreement, the City presented the testimony of its current City Attorney, Ted Williams. In 1992, Williams was the attorney responsible for negotiating and drafting collective bargaining agreements on behalf of the City. He assisted in negotiating the patrol officers' collective bargaining agreement in 1992. Williams testified that during the course of the negotiations, Police Chief John Capehart requested that the City propose that the patrol officers' contract include a requirement that in order to be eligible to take the sergeant's exam the patrol officer must possess an associates degree. Williams stated that Chief Capehart wanted this provision in order to "upgrade" the police department. Williams testified that he made the proposal to the Business Agent for Teamsters Local 214, which represented the patrol officers and that the union agreed to the proposal.[17] The City also introduced testimony of Herbert Kaufman, an experienced police officer, bargainer, and teacher of future police officers. He testified that the education requirement was a sign of a progressive police department.

Plaintiffs introduced testimony that there are plenty of good sergeants, lieutenants, captains and chiefs who have no formal education beyond high school. Plaintiffs did not, however, introduce any evidence that the insertion of the education requirement was a mere pretext or that the requirement was put into the contract without the knowledge of Teamsters officials.

On its face, the education requirement is not discriminatory. As the testimony of Officer Leonard demonstrated, the education requirement adversely impacted both white and black officers who did not possess an associates degree.

Furthermore, the evidence does not support a finding that Chief Capehart requested the educational requirement for discriminatory reasons. It was Chief Capehart who encouraged Rake to take the sergeant's exam in 1991, and who requested Rake to state in writing whether he would become a resident of the City so that Rake could take the oral board for sergeant. It was also Chief Capehart who would have included military police experience as "police department" experience so that Rake's co-plaintiff, Kresnak, could become a sergeant. *See infra* 1340–1342. There is no evidence whatsoever, that Chief Capehart ever acted out of a personal or institutional racial bias in requesting this educational requirement. At most, the proofs raise suspicions that behind-the-scenes manipulating by members of the City Council frustrated Chiefs Howell and Capehart in their attempts to promote Rake.

Even if Rake failed to introduce evidence sufficient to overcome the City's nondiscriminatory reason for inserting the education requirement in the 1992 contract, the question still remains of whether there is sufficient "direct" evidence of discrimination to submit Rake's case regarding the education requirement to the jury. *See LaPointe I,* 8 F.3d at 380. In this regard, Rake's evidence must consist of more than a mere scintilla; Rake must produce evidence that creates a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (material facts are those which might affect the outcome of the case under governing law).

As to direct evidence regarding promotions, Rake submitted two pieces of testimony: a statement of Police Chief Howell in 1983 that the City had affirmative action, and

---

**16.** This educational requirement also made some black officers ineligible for the exam.

**17.** Plaintiffs introduced testimony of officers that they were never informed by the Teamsters Local

that the education requirement was inserted into the contract. The Teamsters filed an unfair labor practice charge against the City on this issue but that charge was dismissed.

the statement by Chief Capehart to Kresnak in 1993, that two members of the City's personnel committee told Chief Capehart that no white would be promoted to sergeant until Latrice Sain was promoted to sergeant. These statements are not sufficient "direct evidence" to sustain a verdict for Rake. Chief Howell's 1983 statement is simply too remote in time, and it does not comport with other facts admitted into evidence. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330–31 (6th Cir.1994) (finding that comments made almost a year prior to layoff were too long before the layoff to have influenced the termination decision). There was no evidence that the City adopted an affirmative action plan, either formally or informally. Chief Howell was not involved with any personnel decisions after he left the department in January 1989. Also, in 1988 on his last day in office, Chief Howell tried to promote Rake instead of black officer George Hubbard, even though both Rake and Hubbard had passed the sergeant's exam.

The 1993 statement by Chief Capehart regarding Latrice Sain was simply a re-telling of what two council members had told him. It was made after, not in the course of, any employment decision regarding either Rake or Kresnak. Also, the City produced unrebutted evidence that these council members had no authority whatsoever to delay the promotion of white patrol officers until Latrice Sain was promoted. It is reasonable to assume that Chief Capehart was aware of their lack of authority on this matter. More importantly, the substance of the alleged statement by the two council members was simply not true. George Hubbard, a black, was promoted to sergeant on April 13, 1995; Rake was promoted to sergeant on January 28, 1996; Gerald Dibble, a white, was promoted to sergeant in the Spring of 1996. Kresnak (white), Lynne Gill (white), Latrice Sain (black), and Mel Jordan (black) were all promoted on May 12, 1996. Thus, two whites and one black were promoted to sergeant before Latrice Sain; and two whites and one black were promoted to sergeant along with Latrice Sain.

The statements Rake relies upon are isolated statements which should not be considered as direct proof of discrimination. See cases cited on pages 13–16 of this Opinion. For instance, in *Boger v. Wayne County*, 950 F.2d 316 (6th Cir.1991), an assistant county executive told the County Medical Examiner that the Medical Examiner could not interview four white employees of the Medical Examiner's office for a promotion and that the Medical Examiner could not consider anyone except a specific black woman. This evidence was considered insufficient to establish a jury question about whether the defendants discriminated against one of the whites. The Court held the evidence did not establish that the defendants "intentionally and purposefully" discriminated against plaintiff because of her race; there was an ongoing power struggle between the Medical Examiner and the assistant county executive. *Id.* at 325–26. In like fashion, Latrice Sain may have been preferred for reasons other than race. A recent unreported case is closer to the facts of the instant case and, although it is not considered precedent, the case is illustrative. In *Boggs v. Commonwealth of Ky.*, No. 95–6452, 1996 WL 673492 (6th Cir. Nov. 20, 1996), the plaintiff, a police officer on a predominantly black police force on a predominantly black college campus, claimed to have been told by the chief, "they won't let me promote you." *Id.* at *3. The Sixth Circuit stated, ". . . we do not believe that the evidence is sufficient to create an inference that Chief Mason discriminates against whites." *Id.* at *4.

For the foregoing reasons, the City's motion for judgment as a matter of law as to Ronald Rake will be granted.

*Thomas Kresnak*

 Kresnak became a police officer with the Muskegon Heights Police Department on July 1, 1990. Prior to becoming a member of the City's force, Kresnak had spent about three and one-half to four years as a military policeman with the United States Army. During his military experience, Kresnak co-operated with and assisted local civilian departments and federal agencies. Kresnak's job with the City's police department was his first non-military police department position.

Until May 12, 1996, when he was promoted to sergeant, Kresnak was a patrol officer and

a member of Teamsters Local 214. The collective bargaining agreement between Teamsters Local 214 and the City contained the following requirement for taking the sergeant's exam: "Patrolmen having attained five years service on any police department, but employed by the Muskegon Heights Police Department."

In 1992, Chief Capehart encouraged Kresnak to take the exam for sergeant. Kresnak was only eligible to take the exam in 1992 if the collective bargaining agreement credited his military police experience toward the five year "police department" experience requirement. In April 1992, shortly before Kresnak took the exam, a black officer, George Hubbard, filed a grievance with the City and the Teamsters arguing that in 1985, he had not been permitted to credit his military time toward the five year "police department" experience requirement. Hubbard argued that Kresnak should not be allowed to take the exam because he did not have five years experience on a police department. Kresnak took and passed the exam in April 1992, but he was not immediately promoted.

On February 5, 1993, the Teamsters Local 214 wrote to the City as follows:

> After careful investigation and discussion with other police agencies, it is our belief that the use of military police time is not, and should not be acceptable to fulfill the contractual obligation of time worked in a police agency as it applies to eligibility for promotion. The LETOC has informed us that they do not accept military police time when considering the certification of officers.
>
> We are informed that contract negotiations have or will soon begin. It is our hope that this issue can be resolved through that process.
>
> We are requesting that you hold the promotion to Sergeant in abeyance until the completion of negotiations. If you feel you cannot grant this request, please inform

Mr. Bennett so he may file for arbitration in this matter.

The City did not promote Kresnak, nor did it request arbitration. Kresnak contends that the failure to promote him in 1992 was a discriminatory act.

Kresnak is not arguing that it is discriminatory to require an officer to have five years experience with a "police department" before being eligible to sit for the sergeant's exam. Rather, Kresnak claims that by not crediting his military police experience, the City interpreted a reasonable contract provision in a discriminatory manner.

In this Court's judgment, the contract language does not specify whether military police experience may count toward the five year "police department" experience. In any event, the party that entered into the contract as Kresnak's representative, Teamsters Local 214, ruled that military police time did not count toward the five years and asked the City to hold Kresnak's promotion in abeyance pending negotiations. The outstanding Hubbard grievance and Teamsters Local 214's resolution of that grievance are non-discriminatory reasons why the City did not promote Kresnak in 1992. Kresnak has submitted no evidence to rebut these non-discriminatory reasons, although he did note that Teamsters Local 214 did not rule on the issue until February 1993.[18] This Court does not believe that the timing of the Teamsters' ruling (10 months after the grievance was filed) undermines the evidentiary value of the ruling. It is true that the City could have, perhaps, given Kresnak a temporary promotion pending the outcome of Officer Hubbard's grievance, but Kresnak did not file the instant claim because he did not receive a temporary promotion. His claim is that he did not receive a permanent promotion.

It must also be kept in mind that Chief Capehart was *trying to promote* Kresnak. The promotion process was stopped because

---

**18.** Kresnak also introduced proof that he encouraged the City to purchase and help train a police dog to assist in narcotics detection and other investigatory matters. Kresnak testified that he was told that no white officer would get the dog because of race riots that occurred in Alabama and California in the 1960's. Kresnak said that

he could not understand why something that happened way back in the 60's would have anything to do with him in the 1990's. Mayor Robert Warren, who is considerably older than Kresnak and from Mississippi, testified that giving a dog to a white officer caused some concern but it was not an overriding consideration.

of Hubbard's grievance which, for all practical purposes, was sustained by the Union— to Kresnak's detriment. Further, it was not discriminatory for the City to wait until it received the results of Hubbard's grievance before promoting Kresnak. In fact, if the grievance was sustained, then, in retrospect, it would have been improper for the City to have promoted Kresnak. Trying to "undo" a promotion can be more difficult for an employer than refusing to make the promotion in the first place.

Finally, this Court's comments regarding Plaintiffs' "direct" evidence and the education requirement, which appear in the discussion regarding Rake also apply to Kresnak.

For these reasons, Defendant's motion for judgment pursuant to Fed.R.Civ.P. 50 as to Kresnak will be granted.

### *Respondeat Superior Liability*

The City also claims that there is insufficient evidence in the record to support a rational verdict that the City's acts were a result of the City's policy, custom, or practice. Plaintiffs can bring a claim under Section 1983 when they are deprived "of any rights, privileges, or immunities secured by the Constitution and laws," as a result "of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. In this case, in order to prove a violation of Section 1983, Plaintiffs have the burden of proving that the discrimination was because of a policy, custom, or usage of the City of Muskegon Heights. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (analyzing Section 1983); *Owen v. City of Independence*, 445 U.S. 622, 633, 100 S.Ct. 1398, 1406, 63 L.Ed.2d 673 (1980) (finding that in a Section 1983 case personnel decision made by city council constitutes official city policy).

In *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (plurality opinion), the Court stated that in order to prevail on a Section 1981 claim, the plaintiff must demonstrate that the

section's protected "right to make contracts" is subject to the same "custom or policy" requirement set forth in *Monell. Id.* at 738, 109 S.Ct. at 2724. The Court adopted the "explicit remedial provisions of § 1983" to be controlling in the context of damages actions brought against state actors under Section 1981.[19] *Jett*, 491 U.S. at 731, 109 S.Ct. at 2726. *See also Philippeaux v. North Cent. Bronx Hosp.*, No. 96–7362, 1996 WL 680758, at *1 (2d Cir. Nov. 22, 1996) (relying on *Jett* in ruling that to recover under Section 1981, a plaintiff must show a "custom or policy" of the alleged discriminatory conduct). A municipal liability claim must be examined by applying a two-pronged inquiry:

(1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and

(2) Whether [the City] is responsible for that violation.

*Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir.1996) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992)). "For liability to attach, both questions must be answered in the affirmative." *Id.*

■ The City's argument, that it is not liable because there is no respondeat superior liability, does not apply to Plaintiffs' claim that the City violated Michigan's Elliott–Larsen Civil Rights Act.[20] The standards under the Elliott–Larsen Act mirror those of Title VII, where vicarious liability of an employer for the acts of employees is permitted and where intentional discrimination is prohibited regardless of whether it is part of an official policy. *See Rabidue*, 805 F.2d at 617 (stating that language of Elliott–Larsen Act addressing disparate treatment tracked language of Title VII); *Biver v. Saginaw Township Community Sch.*, No. 88–1667, 1989 WL 74654, at *3 (6th Cir. July 10, 1989) (same). Furthermore, M.C.L. § 37.2201(a) specifically includes in the definition of an employer the employer's agent. *Jenkins v. Southeastern Mich. Chapter, American Red Cross*, 141 Mich.App. 785, 799, 369 N.W.2d 223, 230 (1985).

In *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 545 N.W.2d 596 (1996), the

---

**19.** *Jett*'s plurality opinion also includes a lengthy history of the genesis of § 1981.

**20.** This Court asserted supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

Michigan Supreme Court stated that when an employer gives supervisors certain authority over other employees, it must accept responsibility to remedy the harm caused by the supervisor's unlawful exercise of that authority. *Id.* at 712, 545 N.W.2d at 601 (citing a Title VII case, *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982)).

■ This Court is satisfied that *respondeat superior* liability would attach to the City pursuant to Plaintiffs' Elliott–Larsen claims because the Police Chief or the City refused to promote Plaintiffs because of his race. Therefore, if this Court assumes, arguendo, that the Court of Appeals reverses this Court's decision regarding substantive liability, judgment would still be entered in favor of Plaintiffs for violations of the Elliott–Larsen Civil Rights Act whether or not Plaintiffs have established a wrongful municipal policy, custom, or usage as is required by Sections 1981 and 1983.

Therefore, this Court need not determine at this time whether there was sufficient evidence to submit to the jury on whether the City's employment decisions regarding Plaintiffs were a result of the City's policy, custom, or usage.

### Conclusion

For the reasons stated in this Opinion, a separate Order will be entered GRANTING Defendant's motion for judgment as a matter of law.

### ORDER

For the reasons stated in the written Opinion entered today,

**IT IS HEREBY ORDERED AND ADJUDGED** that Defendant's Motion for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(b)(1)(C) is **GRANTED.** The Clerk shall enter judgment for Defendant.

### APPENDIX

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS KRESNAK and RONALD RAKE,

Plaintiffs,

v.

CITY OF MUSKEGON HEIGHTS,

Defendant.

Case 'No. 1:95–CV–400

HON. GORDON J. QUIST

### VERDICT—*Thomas Kresnak*

We the jury unanimously find as follows:

1. Has Mr. Kresnak carried his burden of proving that after June 16, 1992, the City of Muskegon Heights failed or refused to promote him to sergeant because of his race?

___✓___ Yes _____ No

If your answer to question no. 1 is "No," your deliberations regarding Sergeant Kresnak are concluded and your foreperson should sign this jury verdict form.

If your answer to question no. 1 is "Yes," please answer question nos. 2, 3, 4 and 5.

2. Has Mr. Kresnak proven by a preponderance of the evidence that the racial discrimination which you found in your answer to question no. 1 was a result of the City's policy or custom?

___✓___ Yes _____ No

3. Has the City of Muskegon Heights proven by a preponderance of the evidence that it would not have promoted Mr. Kresnak even if he had been an African American?

_____ Yes ___✓___ No

4. What is the amount of damages sustained by Mr. Kresnak?

$3,000

5. What is the amount of damages for any pain, suffering, or mental anguish suffered by Mr. Kresnak?

$23,000

Dated: December 18, 1996

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS KRESNAK and RONALD RAKE,

Plaintiffs,

v.

CITY OF MUSKEGON HEIGHTS,

Defendant.

Case No. 1:95–CV–400

HON. GORDON J. QUIST

### *VERDICT—Ronald Rake*

We the jury unanimously find as follows:

1. Has Mr. Rake carried his burden of proving that after June 16, 1992, the City of Muskegon Heights failed or refused to promote him to sergeant because of his race?

\_\_\_\_\_ Yes \_\_√\_\_ No

2. Has Mr. Rake carried his burden of proving that after June 16, 1992, the City of Muskegon Heights prevented him from taking a sergeant's test because of his race?

\_\_√\_\_ Yes \_\_\_\_\_ No

If your answer to question nos. 1 and 2 are "No," your deliberations regarding Sergeant Rake are concluded and your foreperson should sign this jury verdict form.

If your answer to question no. 1 or 2 is "Yes," please answer question nos. 3, 4, 5, 6 and 7.

3. Has Mr. Rake proven by a preponderance of the evidence that the racial discrimination which you found in your answer to question no. 1 and/or no. 2 was a result of the City's policy or custom?

\_\_√\_\_ Yes \_\_\_\_\_ No

4. Has the City of Muskegon Heights proven by a preponderance of the evidence that it would not have promoted Mr. Rake even if he had been an African American?

\_\_\_\_\_ Yes \_\_√\_\_ No

5. Has the City of Muskegon Heights proven by a preponderance of the evidence that it would have prevented Mr. Rake from taking a sergeant's test even if he had been an African American?

\_\_\_\_\_ Yes \_\_√\_\_ No

6. What is the amount of any lost wages and fringe benefits sustained by Mr. Rake?

$\_\_\_\_ 9,000

7. What is the amount of damages for any pain, suffering, or mental anguish suffered by Mr. Rake?

$\_\_\_\_ 25,000

Dated: December 18, 1996