LAMORIA v HEALTH CARE & RETIREMENT CORPORATION
Docket No. 199795. Released July 10, 1998, at 9:00 A.M.; vacated July 24, 1998.

Before: FITZGERALD, P.J., and O'CONNELL and WHITBECK, JJ.

PER CURIAM. Plaintiff Barbara Lamoria[1] appeals as of right the trial court's grant of summary disposition. Lamoria filed this action after she was discharged from her employment at defendant Sun Valley Manor, Inc., a retirement home owned by defendant Health Care & Retirement Corporation (HCR). Defendant Marilyn K. Martin was, at the time of Lamoria's discharge, the administrator of Sun Valley. In pertinent part, Lamoria alleges that her discharge (1) violated the prohibition of the state Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, against weight and age discrimination, (2) violated the Handicappers' Civil Rights Act, MCL 37.1202(1)(b); MSA 3.550(202)(1)(b), with respect to handicap discrimination related to an injury that Lamoria suffered in the course of her employment, and (3) constituted illegal retaliation for plaintiff's seeking worker's compensation benefits. Lamoria advanced additional claims on which the trial court also granted summary disposition to defendants, but Lamoria does not challenge the grant of summary disposition on those claims. In contrast, defendants assert that Lamoria was discharged in accordance with HCR's policy of discharging employees who do not return to work after having been on a medical leave of absence for six months. We reverse the grant of summary disposition with respect to the claims at issue in this appeal and remand for further proceedings consistent with

---

[1] Plaintiff's last name is spelled "Lamoria" in her brief on appeal, but variously as "Lamoria" and "LaMoria" in some lower court documents. We adopt the spelling used by plaintiff's own counsel.

this opinion. But for MCR 7.215(H), we would affirm the trial court's decision with respect to issue IV. However, as we will discuss more fully in this opinion, MCR 7.215(H) requires us to reverse with regard to issue IV.

### I. FACTS

Lamoria has been a registered nurse since 1959 and was employed in that capacity (including time spent on leave) for nearly twenty years at Sun Valley, from September 9, 1975, until July 7, 1994. However, Lamoria stated in an affidavit[2] that she was not officially notified that her employment had been terminated until October 1994. Lamoria alleged in her complaint that, at the time her employment was terminated, she was fifty-five years old, 5' 7" tall and weighed about 240 pounds and that, previously, she had weighed as much as 311 pounds. Lamoria stated that she began working at Sun Valley as a staff nurse and was promoted in 1991 to the position of "Nurse (Unit) Manager." According to Lamoria, her "last evaluation in August, 1993, stated that [she] had a 'demonstrated loyalty' to Sun Valley Manor and that [she] had the potential for promotion within HCR."

Ruth Wilcox, who also had worked at Sun Valley, testified in her deposition that she had the opportunity to review Lamoria's work or watch her interact with patients. When asked for her opinion of Lamoria's work performance as a nurse, Wilcox testified:

I respect her. She has good standards. She's honest and credible and trustworthy. She expressed and demonstrated a lot of behaviors that are consistent with a high degree of caring. I would describe her as dedicated.

Wilcox did not recall having any problems with Lamoria during the time that Wilcox was serving as the internal administrator or director of nursing at Sun Valley. Lamoria stated in her affidavit that Martin was hired as the administrator of Sun Valley by Dan Livy, a regional manager for HCR in December 1993.

Lamoria suffered a knee injury as a result of a fall at Sun Valley on August 9, 1993, during the course of her employment. Lamoria went on a medical leave from her employment in January 1994.

Faith Hall indicated in her affidavit that she worked at Sun Valley as a "Nurse Consultant" when Martin was hired as the administrator for Sun Valley. Hall stated that, in her first meeting with Martin at Sun Valley, Martin proclaimed that she was going to "clean house" and that she intended to get rid of the employees who had been at Sun Valley the longest because they "would be the hardest to change." Hall also stated that "Martin said that HCR sought her out for this position and brought her in specifically to clean out the older employees." According to Hall, "Martin made

---

[2] All the references in this opinion to statements in affidavits and to deposition testimony in this case refer to evidence that was submitted to the trial court before its decision on defendants' motion for summary disposition.

comments about immediately terminating the director of nursing, several dietary department personnel, and some of the older nurses." Hall stated that Martin and Livy referred to a "hit list" of employees whom they sought to terminate and that "in several instances [they] would 'target' an employee for termination, then begin to build a case for termination or instead force the person to resign." Hall also stated that Martin and Livy "made critical and harsh remarks in [Hall's] presence about the weight of some Sun Valley Manor personnel, including Annette Smith and Barbara Lamoria, in a manner that suggested to [Hall] that they intended to terminate people who they perceived as overweight."

Brenda LaVigne, who was employed by Sun Valley as a social worker, stated that, while she was at Sun Valley, Martin became the administrator. LaVigne made the following statements about Martin in her affidavit:

> 4. Marilyn Martin threatened to fire me on several occasions without justification.
>
> 5. Shortly after she started in December, 1993, Martin began to terminate several of the department heads[,] including nursing supervisors. These employees were then replaced with younger employees.
>
> 6. Among the department heads or supervisors fired by Martin or forced to resign were Annette Smith, Director of Nursing; Sharon DeWhale, Director of Nursing; Donna Hair, Social Worker; Dennis Fox, Nurse Supervisor; and Belda Denzer, Nurse Supervisor.
>
> \*   \*   \*
>
> 8. Martin did not like over-weight people. Martin made disparaging comments about heavy people, including Sun Valley Manor employees.
>
> 9. Annette Smith, Donna Hair and Barbara Lamoria were all overweight by Martin's standards, and all were fired or forced to resign while Martin was Administrator.

According to LaVigne, "Martin hired younger, more attractive people to enhance the 'corporate image' of HCR and to replace the people that Martin wanted to terminate." LaVigne also stated that Martin knew that Lamoria needed surgery to repair her knee and that Martin would be off work for a long time rehabilitating her knee. According to LaVigne, Martin did not want HCR to pay for the cost of this surgery or rehabilitation.

Annette Smith-Jones indicated in her affidavit that she was employed as the director of nursing when Martin was hired as the administrator. According to Smith-Jones, Martin along with Livy "almost immediately began trying to fire [Smith-Jones] from [her] job." Smith-Jones stated that, at meetings, "Martin often stated how she had no use for certain people, targeting in particular some of the nurse unit managers and African-American licensed practical nurses."

Defendants stress a provision of the "HCR Employee Handbook" regarding medical leaves that includes the statement, "Normally, a Medical Leave of Absence with extensions may not exceed six months." However,

Lamoria stated that she went to Sun Valley each month from February to August 1994 to complete the necessary forms to extend her leave of absence "for another month while HCR delayed my surgery." Lamoria further stated that no one advised her during any of these visits that her leave would expire at some point or that she had to return to work by a certain date or face termination. Each time, Lamoria filled out a form on which she stated that her leave of absence was "work related" and that her estimated date of return to work was "undetermined." Lamoria stated that, each time, Martin approved the leave form without modification. Further, according to Lamoria, neither Martin nor HCR ever stated on the form that the leave would expire at some point, although there is a space on the form to designate the end of a leave period. Lamoria also stated that she visited Sun Valley about ten times during her leave period to complete various paperwork and that she was given no notice of her impending termination during those visits.[3]

Kenneth Distler, M.D., an orthopedic surgeon, stated in an affidavit that he performed an arthroscopic procedure on Lamoria on January 10, 1994. The costs associated with this procedure, as well as benefits for partial wage loss and medical bills, were paid by ITT Hartford, which administered worker's compensation claims for HCR. However, Dr. Distler stated that he thereafter determined that Lamoria's left knee was not responding to treatment and that a total knee replacement was needed to restore her knee to "functionality." Dr. Distler stated that, in his opinion, Lamoria's problem with her knee was caused by degenerative arthritis that was aggravated by the August 1993 injury.

According to Dr. Distler, he requested authorization from Lamoria's employer to have the cost of the surgery paid under an insurance policy covering work-related injuries "as the cause of [Lamoria's] condition was at least partially related to a fall [Lamoria] had while on the job in August, 1993." Dr. Distler stated that the surgery was not scheduled because of the uncertainty regarding Lamoria's insurance coverage. He said that HCR never contacted his office to advise him whether HCR would pay for the cost of the surgery. Dr. Distler stated that, "[i]f Ms. Lamoria has surgery, [he] would expect her to return to a normal life, including productive work as a nurse, although she will have some restrictions on her work and activities for a brief period of time." He stated that "Ms. Lamoria's knee would improve with surgery because a replacement knee would have corrected not only the problems brought about by her fall, but also any of the degenerative arthritic problems that she has experienced."

Lamoria stated in her affidavit that she contacted HCR and ITT Hartford on several occasions from March to June 1994 "trying to get answers to why the surgery was not being done and about [her] condition, and each time [her] questions largely went unanswered or [she] was told that no decisions had yet been made." Lamoria stated that she was told by Sun

---

[3] Presumably, Lamoria meant that she visited Sun Valley about ten times in addition to the monthly visits from February to August 1994 to extend her leave of absence.

Valley personnel in May 1994 that her file had been "taken over" by Martin and Livy and that Martin had been in contact with HCR personnel who were in charge of worker's compensation claims. Lamoria stated that it was about this time that her file was transferred within ITT Hartford from Susan Billiett to Wayne Beechum and that Beechum told her that he was taking over her file because HCR was not satisfied with the way that Billiett was handling her case.

Lamoria stated that on June 29, 1994, she was finally told by Beechum that a decision had been made to deny her worker's compensation coverage for her surgery. Lamoria further stated that Beechum told her, on June 29, 1994, that he was being pressured by HCR to deny the claim, that "he had 'no alternative' but to stop compensation payments because HCR had told him to do it" and that "HCR was 'self funded' for worker's compensation insurance, thus HCR could tell him to stop payments, a fact noted in [Lamoria's] records of the conversation."

## II. REVIEW OF A GRANT OF SUMMARY DISPOSITION

We review a trial court's grant of summary disposition de novo. *Paul v Lee*, 455 Mich 204, 210; 568 NW2d 510 (1997). In reviewing a motion for summary disposition based on MCR 2.116(C)(10), we review the documentary evidence and determine whether a genuine issue of material fact exists. *Paul, supra* at 210. In doing so, we draw all reasonable inferences in the nonmovant's favor and give the nonmovant the benefit of any reasonable doubt. *Id.* "Summary disposition is appropriate only if the court is satisfied that it is impossible for the nonmoving party to support his claim at trial because of a deficiency that cannot be overcome." *Id.* However, a party opposing a motion for summary disposition under MCR 2.116(C)(10) may not rest on its pleadings, but must come forward with evidence to show the existence of a material factual dispute. *Paul, supra* at 210-211. If the nonmoving party fails to show that a material fact is at issue, the motion would be properly granted. *Id.* at 211. Granting a motion for summary disposition is especially suspect where motive and intent are at issue or where the credibility of a witness or deponent is crucial. *Vanguard Ins Co v Bolt*, 204 Mich App 271, 276; 514 NW2d 525 (1994).

### III. LAMORIA'S CLAIMS UNDER THE STATE CIVIL RIGHTS ACT

#### A. GENERAL PRINCIPLES

MCL 37.2202; MSA 3.548(202) provides in part:

> (1) An employer shall not do any of the following:
> (a) Fail or refuse to hire or recruit, *discharge*, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, *age*, sex, height, *weight*, or marital status. [Emphasis added.]

The trial court in its written opinion provided the following explanation for its grant of summary disposition to defendants with regard to

Lamoria's claims that her discharge was based on weight and age discrimination contrary to the state Civil Rights Act:

> In a discrimination case, the plaintiff has the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff is successful, then the burden of proof shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. The plaintiff then has the burden to prove that defendants['] reason for its actions was a mere pretext. *Plieth v St Raymond Church*, 210 Mich App 568, 571 [534 NW2d 164] (1995); *Barnell v Taubman Co, Inc*, 203 Mich App 110, 120 [512 NW2d 13] (1993). To establish a prima facie case of employment discrimination, the plaintiff must demonstrate, as a threshold matter, that she was qualified for the position. *Ackerman v Diamond Shamrock Corp*, 670 F2d 66, 69 (CA 6, 1982). In *Baughey v Tecumseh Country Club*, 778 F Supp 354 (ED Mich, 1991), vacated 989 F2d 498 (CA 6, 1993), aff'd 1 F3d 1240 (CA 6, 1993), the court found that a former employee failed to establish a prima facie case of age or sex discrimination where she was unable to perform her job due to an on-the-job injury prior to her discharge. While Ms. LaMoria may have all necessary state licensures and other qualifications for the position of Nurse Manager or Staff Nurse, it is not disputed that she cannot physically perform either position. Therefore, she has failed to establish a prima facie case of employment discrimination. Defendants['] motion for summary disposition is granted as there is no evidence to establish a material factual dispute. Since plaintiff has not established a prima facie case, the court need not consider the disparate treatment nor the intentional discrimination claims.

With regard to Lamoria's claims of weight and age discrimination, the trial court's analysis overlooks that the prima facie case, as part of a mechanism for shifting the burden of producing evidence, is merely one method that an alleged victim of illegal discrimination may use in attempting to show disparate treatment in violation of the state Civil Rights Act. The "prima facie case" derives from the construct established in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), for analysis of employment discrimination claims under title VII of the federal Civil Rights Act that involve only circumstantial evidence of discrimination. See *Harrison v Olde Financial Corp*, 225 Mich App 601, 606-607; 572 NW2d 679 (1997). However, where a plaintiff offers direct evidence of discriminatory animus by a decisionmaker in connection with a claim of employment discrimination, the prima facie case construct, as part of the *McDonnell Douglas* framework, is inapplicable:

> [W]hile the *McDonnell Douglas* burden-shifting analysis is appropriate in cases without direct evidence of discrimination, this case presents a different situation. Federal case law holds, and we agree, that the *McDonnell Douglas* evidentiary framework does not apply when a plaintiff presents direct evidence of discriminatory

animus. *Kresnak v Muskegon Heights*, 956 F Supp 1327 (WD Mich, 1997); see also *Matras v Amoco Oil Co*, 424 Mich 675, 683-684; 385 NW2d 586 (1986). "Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of [the] defendant's discriminatory intent." *Blalock v Metals Trades, Inc*, 775 F2d 703, 707 (CA 6, 1985). [*Harrison, supra* at 609-610; see also *Downey v Charlevoix Co Bd of Co Rd Comm'rs*, 227 Mich App 621, 633; 576 NW2d 712 (1998).][4]

Accordingly, where a plaintiff presents direct evidence of discriminatory animus, it is erroneous for a trial court to use the *McDonnell Douglas* framework. *Harrison, supra* at 613.

This Court in *Harrison, id.* at 610, further described what constitutes direct evidence of discrimination:

"Direct evidence" has been defined in the Sixth Circuit Court of Appeals as evidence that, if believed, " ' "requires the conclusion that unlawful discrimination was at least a motivating factor." ' " *Kresnak, supra* at 1335 (citations omitted). For example, racial slurs by a decisionmaker constitute direct evidence of racial discrimination that is " 'sufficient to get the plaintiff's case to the jury.' " *Id.* (citation omitted).

Cases involving direct evidence of discriminatory animus are sometimes called "mixed motives" cases in light of the presentation of such evidence by the alleged victim of discrimination ordinarily coupled with the presentation of other evidence by the employer of legally permissible motives for an adverse employment-related decision:

Thus, when direct evidence of discrimination is involved, we believe that federal case law provides appropriate guidance for analyzing discrimination claims arising under the Michigan Civil Rights Act.

In the instant case, plaintiff testified in her deposition that defendant's employees made derogatory comments about her race. Because of plaintiff's direct evidence of discrimination, this case presents a question of mixed motives, one in which defendant's decision not to hire plaintiff could have been based on several factors, legitimate ones as well as legally impermissible ones. [*Harrison, supra* at 610.]

Direct proof of discriminatory animus ordinarily precludes a grant of summary disposition:

To summarize, we hold that the following principles of proof apply in a typical single-plaintiff, mixed-motive employment dis-

---

[4] In fairness to the trial court, we note that its opinion was issued before the release of the instructive decision in *Harrison*.

crimination case. First, as with circumstantial discrimination cases, in a case involving direct evidence of discrimination, the plaintiff always bears the burden of persuading the trier of fact that the employer acted with illegal discriminatory animus. Second, whatever the nature of the challenged employment action, the plaintiff must establish evidence of the plaintiff's qualification (*or other eligibility*) and direct proof that the discriminatory animus was causally related to the decisionmaker's action. Upon such a presentation of proofs, an employer may not avoid trial by merely "articulating" a nondiscriminatory reason for its action. Under such circumstances, the case ordinarily must be submitted to the factfinder for a determination whether the plaintiff's claims are true. [*Id.* at 612-613; (emphasis added).]

In this case, viewing the evidence favorably to Lamoria, she was as "eligible" to be on a medical leave as was any other employee who was, as a practical matter, unable to perform the employee's job duties because of an injury. In the context of alleged discrimination against an incumbent employee with regard to medical leave, it is not sensible that the employee should have to show that the employee was "qualified" to physically perform the job at the time of discharge. Otherwise, an employer would be free to discriminate against an individual in denying a medical leave based on a protected characteristic under the state Civil Rights Act. In this regard, the *Harrison* panel wisely noted that "other eligibility" could substitute for a demonstration of qualification with regard to a challenged employment action.

### B. WEIGHT DISCRIMINATION

Interestingly, we have found no published opinion of the Michigan Supreme Court or this Court explicitly addressing the elements necessary for a party to establish a claim of weight discrimination.[5] However, in determining whether there was sufficient evidence to support a jury's finding of weight discrimination under the state Civil Rights Act against a motion for judgment notwithstanding the verdict (JNOV), the federal district court in *Ross v Beaumont Hosp*, 687 F Supp 1115, 1123-1124 (ED Mich, 1988), stated that it "must determine whether reasonable minds could have concluded that Ross' discharge would not have occurred but for the Defendants' consideration of [the plaintiff's] weight." On the basis of the plain language of MCL 37.2202; MSA 3.548(202), we agree with the federal district court in *Ross* that if a party directly proves that the party was discharged from employment with the party's weight[6] being a deter-

---

[5] While *Dep't of Civil Rights v Horizon Tube Fabricating, Inc*, 148 Mich App 633, 636; 385 NW2d 685 (1986), involved a successful claim of weight discrimination, the issues on appeal regarded only damages, not liability.

[6] The circumstances of this case do not require us to address the legal ramifications, with regard to a weight discrimination claim, of a person

minative factor in the discharge, then the party has established a claim of weight discrimination.[7]

In *Ross*, the federal district court, in finding that there was enough evidence to preclude JNOV for the employer, noted that a letter of suspension addressed to the plaintiff referred to her failure to provide a monthly letter from the physician treating her obesity. *Ross, supra* at 1124. The *Ross* court further observed:

> On the basis of this letter, a jury could have reasonably concluded that Ross' obesity made a difference in the Defendants' decision to terminate her services. Her obesity was explicitly identified as one of the determining factors.
>
> Ross also produced evidence which showed that various medical committees at the Hospital were aware of Wilson's concerns, and other information, regarding her weight. This evidence could also have led a jury to determine that Ross' weight was a determining factor. In addition, the irregularity of Wilson's request for obesity letters, and his unusual actions in using Ross' weight problem to secure a negative letter from Smith, supports her position on this issue. [*Id.*]

Lamoria alleged in her complaint that, at the time her employment was terminated, she was fifty-five years old, 5' 7" tall and weighed about 240 pounds and that, before her injury on August 9, 1995, she had weighed as much as 311 pounds. A reasonable factfinder could conclude that Lamoria was "overweight." Because defendants did not attack these assertions in their motion for summary disposition, Lamoria had no obligation to present evidence in support of these assertions to prevent a grant of summary disposition under MCR 2.116(C)(10). See MCR 2.116(G)(4); *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

Lamoria has produced direct evidence that Martin expressed hostile views toward "overweight" employees at Sun Valley, including Lamoria herself. LaVigne stated in her affidavit that Martin made disparaging comments about "heavy people," including Sun Valley employees. Further, Hall stated in her affidavit that Martin and Livy "made critical and harsh remarks in [Hall's] presence about the weight of some Sun Valley Manor personnel, including Annette Smith and Barbara Lamoria, in a manner that suggested to [Hall] that they intended to terminate people who they

---

being discharged on the basis of an ability to perform an essential job function that is in turn caused by the person's weight as opposed to a decision to discharge an employee directly on the basis of the employee's weight.

[7] Because, as we will discuss below, Lamoria has presented direct evidence of weight-based animus, we need not consider whether and, if so, how the *McDonnell Douglas* construct with its prima facie case concept should apply to claims of weight discrimination based on circumstantial evidence.

perceived as overweight." This evidence of hostile remarks by a supervisory or managerial level employee based on weight is similar to the racial slurs discussed in *Harrison, supra,* and may be evidence of animus based on a characteristic upon which discrimination is forbidden by the state Civil Rights Act.[8]

Further, LaVigne stated that "Annette Smith, Donna Hair and Barbara Lamoria were all over-weight by Martin's standards, and all were fired or forced to resign while Martin was Administrator." From this evidence, a reasonable factfinder might infer that Lamoria's weight was a decisive factor in defendants' decision to discharge Lamoria. Accordingly, Lamoria presented enough direct evidence to support a conclusion that she was discharged on the basis of her weight. The trial court erred in granting defendants' motion for summary disposition with respect to Lamoria's claim of weight discrimination in violation of the state Civil Rights Act. See *Harrison, supra* at 612-613.

### C. AGE DISCRIMINATION

This Court in *Downey, supra* at 633-634, found the following to constitute direct evidence of age discrimination:

> Lionel McClanaghnan, an employee at the Ironton garage, testified at his deposition that Hamlin [the manager of the road commission] made a comment to a group of employees about "getting rid of older employees" because they "weren't doing the job." McClanaghan testified that Hamlin stated, "If I have to, I will get rid of the older guys—you older guys and replace you with younger ones." Patrick Whitely testified that in the summer of 1994, when he had considered leaving his job, Parsel [a supervisor] told him: "Don't quit now. We will get rid of these old guys, and we will have a good crew." Whitely also stated that Parsel would "pick on" the older workers and give preferential treatment to the younger work-

---

[8] In reaching this conclusion, we regard it as important that racial slurs and derogatory remarks about others whom the speaker regards as "overweight" both display, on their face, hostility toward a group protected by the state Civil Rights Act and reasonably may be considered as indicating a likelihood that the speaker would discriminate against the targets of the remarks. However, in other contexts, we would not expect trial courts faced with motions for summary disposition on claims of weight discrimination to ignore real differences between the characteristics of race and weight. Race is basically an immutable characteristic; being of a particular race is not a negative attribute. In contrast, weight is an aspect of oneself that is subject to some control by one's conduct. It is common knowledge that many health professionals advise against being "overweight." Accordingly, comments that could be reasonably taken as mere advice about diets and the like do not amount to expressions of animus sufficient to indicate a likelihood that one would engage in illegal weight discrimination.

ers. There was additional deposition testimony from Stangis that Parsel used the term "old guys" all the time. Martinchek also testified that Hamlin believed the "old guys" were lazy. Further, plaintiff testified that Downey told her that Hamlin was "going to get rid of all of us older guys. He wants the older men out of there."

Here, there was similar direct evidence of discriminatory animus. According to Hall's affidavit, Martin told Hall that "HCR sought [Martin] out for this position and brought her in specifically to clean out the older employees." Further, Hall stated that Martin made comments about immediately terminating some of the older nurses. In light of Lamoria's unopposed assertion that she was fifty-five years old when her employment was terminated, a reasonable factfinder could infer that Martin regarded her as an "older" employee. Considering the foregoing, LaVigne's affidavit could reasonably be considered as providing evidence that Martin actually carried out defendants' plan to terminate older employees:

Shortly after she started in December, 1993, Martin began to terminate several of the department heads[,] including nursing supervisors. These employees were then replaced with younger employees.

In light of the direct evidence of age-based animus on defendants' part and Lamoria's status as an "older" employee, Lamoria presented sufficient evidence to raise a genuine issue of fact regarding whether she was discharged by defendants because of her age. Thus, the trial court erred in granting defendants' motion for summary disposition with regard to her claim of age discrimination.

### D. THE ALLEGED SIX-MONTH LIMIT ON MEDICAL LEAVES

Defendants argue that Lamoria was discharged pursuant to HCR's policy that employees would automatically be discharged if they did not return from a medical leave at the end of six months. Thus, defendants argue, Lamoria's age was not a determinative factor in the decision to discharge her. A written policy of an employer purporting to require discharge in a certain circumstance that is facially neutral with regard to protected characteristics under the state Civil Rights Act cannot stand as an absolute shield against claims of unlawful disparate treatment discrimination by an employee subject to discharge under the policy unless the employer establishes that the policy is applied uniformly without exceptions. Otherwise, such a policy could be used as a subterfuge to be invoked only when an employer wishes to discharge an employee and could otherwise be ignored.

The policy statement in the employee handbook provided that "*Normally,* a Medical Leave of Absence with extensions may not exceed six months." (Emphasis added.) This is not a statement that an employee who does not or cannot return from a medical leave that has lasted six months will automatically be discharged. Indeed, the qualifier "normally" suggests that there may be circumstances in which an employee will be allowed to

remain on a medical leave for over six months. Further, Hall stated in her affidavit that, at a meeting she attended, HCR Vice President Jim Millspaugh "indicated that the 6-month leave of absence policy could be used to get rid of undesirable employees." If believed by a factfinder, this could be considered as evidence that HCR did not follow a uniform policy of discharging employees who did not return to work immediately after having been on a medical leave for six months but rather allowed supervisory or management level employees to decide selectively whether to discharge such employees.

### IV. LAMORIA'S CLAIM UNDER THE HCRA

In part, Lamoria argues that defendants' refusal to extend her medical leave past six months violated the HCRA in failing to accommodate reasonably the handicap that she suffered when she injured her knee on the job. MCL 37.1202(1)(b); MSA 3.550(202)(1)(b) provides:

An employer shall not:

\*          \*          \*

(b) Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a handicap that is unrelated to the individual's ability to perform the duties of a particular job or position.

In explaining its decision to grant summary disposition to defendants on plaintiff's HCRA claim, the trial court stated:

The court, in *Ashworth v Jefferson Screw Prods Inc*, 176 Mich App 737, 743 [440 NW2d 101 (1989)], determined that "The HCRA covers only those whose disability is unrelated to the ability to perform the job. The handicapped person seeking employment must be capable of performing the duties of the position. *Carr v General Motors Corp*, 425 Mich 313, 321-322 [389 NW2d 686 (1986)]. A disability that is related to one's ability to perform the duties of a particular position is not a "handicap" within the meaning of the HCRA. *Id.*, pp 315-316." [sic] Therefore, Ms. LaMoria is not handicapped within the meaning of HCRA since it is undisputed that she could not perform the duties of her job.

Neither were defendants required to give plaintiff more time to heal. The HCRA does not require that an employer leave a job open until plaintiff's handicap is removed. *Ashworth* at 745. In addition, the employer's duty to make [ ] "reasonable accommodation" does not extend to granting plaintiff a medical leave until such time as she would be able to perform the requirements of her job. *Wilson v Acacia Park Cemetery Ass'n*, 162 Mich App 638, 643-644 [413 NW2d 79] (1987); *Carr, supra*. Ms. LaMoria had already been off work for her injury from August 1993 through August 1994. An employer's

duty to accommodate handicapped employees does not extend to new job placement, *Rancour v The Detroit Edison Co*, 150 Mich App 276, 279 [388 NW2d 336] (1986), lv den 428 Mich 860 (1987), *Ashworth, supra*. Therefore, defendants were not required to offer plaintiff "light duty" work, nor were they required to continue plaintiff's leave of absence when she had already been off work for more than six months, she needed additional surgery and recuperation time, and even then may not be able to perform her job duties. This court, having considered all documents presented by the parties, finds there is no genuine issue of material fact and no factual development could establish this claim. Therefore, defendants' motion to dismiss the HCRA claim is granted.

In *Ashworth, supra* at 739, the defendant laid off the plaintiff, who thereafter suffered serious injuries in an automobile accident. The day after the defendant recalled the plaintiff, he reported to the defendant's office and stated that he was unable to return to work at that time but estimated that he expected to return to work in about two months. *Id.* at 739-740. The defendant discharged him for his "failure to return to work." *Id.* at 740. The plaintiff claimed that he would have been able to perform the requirements of his job within two months of his recall and that the defendant had a duty to reasonably accommodate his handicap by granting him a medical leave. *Id.* at 744. The *Ashworth* panel rejected this position:

> Nowhere in the handicappers' act do we find a requirement that an employer leave a job open until a plaintiff's handicap is removed. . . . [W]e hold that defendants' duty to make a "reasonable accommodation" did not extend to granting plaintiff a medical leave until such time as he would be able to perform the requirements of his job. [*Id.* at 745.]

Thus, if *Ashworth* were controlling, defendants would have had no obligation under the HCRA to provide Lamoria any medical leave whatsoever. However, Judge SHEPHERD dissented in *Ashworth*. With respect to the "reasonable time to heal" issue, Judge SHEPHERD noted that *Carr v General Motors Corp, supra* at 319, contained the following quote from 1976 Senate Journal 590:

> [If] a handicapped person seeking employment meets the qualifications of the job and can attain the performance levels required *within a reasonable time*, he must, by law be given the same opportunity as other applicants to secure the position. [*Ashworth, supra* at 748 (SHEPHERD, J., dissenting) (emphasis in Judge SHEPHERD's dissent).][9]

---

[9] The quotation by Judge SHEPHERD is only part of the passage in 1976 Senate Journal 590 cited in *Carr*. The full citation in *Carr, supra* at 319,

Relying on this language, Judge SHEPHERD concluded that "even if plaintiff were handicapped, the employer must have afforded him a *reasonable time to heal* his wounds on the same conditions as other employees." *Id.* at 748-749. (Emphasis supplied.) This line of reasoning was picked up in *Rymar v Michigan Bell Telephone Co*, 190 Mich App 504; 476 NW2d 451 (1991). The *Rymar* panel conceded that Michigan case law has consistently used the date of termination as the relevant point to assess the status of a disability. *Id.* at 506. The *Rymar* panel went on to state, however, that

> we are not persuaded that the date of termination is the obligatory focal point in every case. We agree with Judge SHEPHERD's reasoning in his dissent in *Ashworth*. A mandatory fixation on the date of termination ignores the factor of time. *Ashworth*, 746. That factor was not relevant in the *Carr* case, where the plaintiff was permanently, not temporarily, disabled. [*Id.* at 506-507.]

The *Rymar* panel then referred to Senator William Faust's "reasonable time" floor remarks in the 1976 Senate Journal and concluded:

> In this case, on the date of termination, plaintiff's disability was related to her ability to do her job. Her condition was not "mentally ill restored." However, there remains unanswered a question whether, within a reasonable time, her disability would cease to adversely affect her capacity to do the work, putting her in a restored condition.
>
> Plaintiff's MHCRA claim is not so clearly unenforceable as a matter of law that no factual development could justify a right to recovery. *Scameheorn v Bucks*, 167 Mich App 302, 306; 421 NW2d 918 (1988). The trial court did not err in denying the motion for summary dis-

---

from the remarks of Senator William Faust, speaking on the Senate floor, is as follows:

> The bill essentially spells out the above areas of civil rights, now guaranteed to all, and applies them with equal force under the law to this new category. Handicapped persons wish to, and, when the legislation is enacted into law, must be judged and accepted based on their ability.
>
> *      *      *
>
> Businesses and public facilities will not be required to go to undue lengths to make facilities more convenient for handicapped individuals. However, if a handicapped person seeking employment meets the qualifications of the job and can attain the performance levels required within a reasonable time, he must, by law be given the same opportunity as other applicants to secure the position.

position as to the handicappers' civil rights claim. [*Rymar, supra* at 507.]

Thus was born the "reasonable time to heal" doctrine. We agree with the comment in *Hatfield v St Mary's Medical Center*, 211 Mich App 321, 329; 535 NW2d 272 (1995), that the soundness of the reasoning in *Rymar* is questionable. First, one senator's statement on the floor of the Senate is a singularly thin basis upon which to read an entirely new doctrine into the HCRA. While this statement may have accurately reflected Senator Faust's view, there can be no certainty whatever that it reflected the view of the entire Legislature.[10] However, even if we can assume that Senator Faust's view was shared by the entire Legislature, given his preceding remarks about not requiring businesses and public facilities to go to "undue lengths" to make facilities more convenient for handicapped individuals, we are not at all certain that this snippet of legislative history reflects *any* legislative intent to require a reasonable time to heal. Finally, we also note that Senator Faust in the remarks directly quoted in Judge SHEPHERD's dissent in *Ashworth* and in *Rymar* was referring to a handicapped person

---

[10] See Scalia, *A Matter of Interpretation: Federal Courts and the Law* (Princeton University Press, 1997), pp 31-32:

> It [legislative history] is much more likely to produce a false or contrived legislative intent than a genuine one. The first and most obvious reason for this is that, with respect to 99.99 percent of the issues of construction reaching the courts, there *is* no legislative intent, so that any clues provided by legislative history are bound to be false. Those issues almost invariably involve points of relative detail, compared with the major sweep of the statute in question. That a majority of both houses of Congress (never mind the President, if he signed rather than vetoed the bill) entertained *any* view with regard to such issues is utterly beyond belief. For a virtual certainty, the majority was blissfully unaware of the *existence* of the issue, much less had any preference as to how it should be resolved. [Emphasis in original.]

See also the concurrence of Justice Jackson in *United States v California Public Utilities Comm'n*, 345 US 295, 319; 73 S Ct 706; 97 L Ed 1020 (1953):

> I should concur in this result more readily if the Court could reach it by analysis of the statute instead of by psychoanalysis of Congress. When we decide from legislative history, including statements of witnesses at hearings, what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them. Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not interpretation of a statute but creation of a statute.

*seeking employment.* To stretch these remarks to give an existing employee a reasonable time to heal following an injury is a remarkable extension indeed.[11]

Therefore, were we permitted, we would affirm the trial court's grant of summary disposition with respect to Lamoria's HCRA claim. Unlike the panel in *Hatfield,* which considered a substantially different factual situation, we can find no principled basis upon which to distinguish the case before us from *Rymar, supra.* See *Hatfield, supra* at 329. Therefore, pur-

---

[11] In this regard, we find the Michigan Supreme Court's recent opinion in *Rourk v Oakwood Hosp Corp,* 458 Mich 25; 580 NW2d 397 (1998), to be instructive. That case, in the main, dealt with the implications of the definition of "handicap" in § 103 of the HCRA as related to an alleged duty to accommodate a handicapped employee by transferring her to a different job or position. Before 1990, in the employment setting, a handicap was defined as a "determinable physical or mental characteristic of an individual or a history of the characteristic which may result from disease, injury, congenital condition of birth, or functional disorder which characteristic . . . is unrelated to the individual's ability to perform the duties of a particular job or position . . . ." After 1990, however, the counterpart of § 103 now defines a handicap as a "determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder if the characteristic . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position . . . ." MCL 37.1103(e)(i); MSA 3.550(103)(e)(i). "Unrelated to the individual's ability" is defined as meaning that "*with or without accommodation,* an individual's handicap does not prevent the individual from . . . performing the duties of a particular job or position." MCL 37.1103(l)(i); MSA 3.550(103)(l)(i). (Emphasis supplied.)

In *Rourk,* the Court held that the 1990 amendment overturned the narrow holding of *Carr, supra,* and that the addition of the language "with or without accommodation" guarantees that an individual otherwise qualified for a particular job or position is entitled to some accommodation if needed. *Rourk, supra* at 31. The Court went on to find, however, that if the Legislature had meant to redefine "accommodation," it would have done so expressly. *Id.* The Court held that this Court's decision in *Rancour v Detroit Edison Co,* 150 Mich App 276; 388 NW2d 336 (1986), interpreting the pre-1990 version of the HCRA, that held that job transfers were not among the accommodations owed by an employer to a handicapped employee, also holds true under the post-1990 amended HCRA. *Rourk, supra* at 30. In this regard, the Court observed that, "[i]t is not for the courts to impose such a burden [of placing an employee in another position] on employers in the absence of express, unequivocal language from the Legislature." *Id.* at 34.

Similarly, we believe, it is not for the courts to impose a "reasonable time to heal" requirement on employers in the absence of express, unequivocal language from the Legislature.

suant to MCR 7.215(H), we must follow and apply the holding of the opinion in *Rymar, supra*, that compels us, reluctantly, to reverse on this issue.

We note that, while Lamoria's argument on this point is somewhat unclear, she apparently asks us to further hold that when an employee has a handicap that prevents the employee from performing a job because of an on-the-job injury covered by worker's compensation, the medical leave for a "reasonable time to heal" under the HCRA required by *Rymar* should extend to a period longer than that for other handicaps. We disagree. The plain language of the HCRA in MCL 37.1202(1)(b); MSA 3.550(202)(1)(b), as set forth above, generally proscribes employment discrimination against the handicapped without drawing any distinctions based on the cause of the handicap. In light of the plain language of the HCRA, there is no basis for concluding that a person who is handicapped because of an on-the-job injury covered by worker's compensation has any greater, or lesser, protection than an employee handicapped for any other reason. *Sanders v Delton Kellogg Schools*, 453 Mich 483, 487; 556 NW2d 467 (1996) (if statutory language is clear, the Legislature must have intended the meaning that it plainly expressed and the statute must be enforced as written). "It is the function of the court to fairly interpret a statute as it then exists; it is not the function of the court to legislate." *Id.*

## V. LAMORIA'S RETALIATORY DISCHARGE CLAIM

In one count of her complaint, Lamoria alleged that she was the victim of a retaliatory discharge for seeking worker's compensation benefits. MCL 418.301(11); MSA 17.237(301)(11), the "antiretaliation provision" of the Worker's Disability Compensation Act (WDCA), provides:

A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

In its written opinion, the trial court stated the following regarding Lamoria's retaliation claim:

Defendants['] next contention is that Ms. Lamoria's retaliatory discharge claim should be dismissed because there is no relationship between her termination and her worker's compensation dispute. She was terminated on a nondiscriminatory basis: She violated her employer's six month leave of absence policy. Defendants assert that their worker's compensation insurance carrier, ITT, made the decision to end Ms. LaMoria's benefits. Plaintiff insists this reason was a pretext and that she was fired because HCR did not want to continue to pay her worker's compensation and her knee replacement surgery. She asserts that ITT cancelled [sic] her benefits only after being told by HCR to do so.

To establish a retaliatory discharge claim, the plaintiff must prove the following: (1) she was engaged in a protected activity, (2) defendants knew of the protected activity, (3) defendants acted adversely to plaintiff, and (4) the protected activity caused the adverse employment activity. *Polk v Yellow Freight System, Inc,* 801 F2d 190, 198 (CA 6, 1986). The plaintiff must prove she was discharged because she exercised her rights under the Worker's Disability Compensation Act (WDCA) and this activity was a significant factor in her employer's decision to discharge her. *Polk* at 198; *Taylor v GMC,* 826 F2d 452, 456 (CA 6, 1987). A retaliatory discharge claim premised on the employer's anticipation of a future claim does not create a cause of action. *Griffey v Prestige Stamping, Inc,* 189 Mich App 665 [473 NW2d 790] (1991); *Wilson v Acacia Park Cemetery Ass'n,* 162 Mich App 638 [413 NW2d 79] (1987). Under *Griffey* and *Wilson,* plaintiff's retaliatory discharge claim fails. Plaintiff had not filed a lawsuit nor an appeal of the worker's compensation denial at the time of her termination. Notes of phone calls by ITT provided by plaintiff do not establish anything other than an anticipation of [a] future claim. Nor can plaintiff show she was discharged for exercising her rights under the WDCA. HCR and ITT paid her benefits except for her knee replacement surgery. An independent IME determined the injury necessitating knee replacement was not work[-]related and plaintiff's own doctor refused to provide an answer to this question. Therefore, Defendants' motion is granted.

An employee has a cause of action in tort if the employee is discharged in retaliation for filing a worker's compensation claim. *Phillips v Butterball Farms Co, Inc (After Second Remand),* 448 Mich 239, 245-249; 531 NW2d 144 (1995). The trial court's analysis fails to properly consider the undisputed fact that Lamoria had filed a claim for worker's compensation benefits and had received worker's compensation coverage on the basis of a work-related injury before her discharge. The anticipatory discharge cases relied on by the trial court are inapplicable.

In *Griffey, supra* at 666, the plaintiff was fired before he filed a worker's compensation claim. This Court concluded that the antiretaliation provision of the WDCA "prohibited discharge in retaliation for having filed a worker's compensation claim, not for the anticipated filing of such a claim" and, thus, held that the plaintiff failed to state a cause of action on which relief could be granted in alleging retaliatory discharge. *Id.* at 666, 668-669.

Similarly, in *Wilson, supra* at 644, the plaintiff alleged, in pertinent part, that the defendant employer "terminated his employment in anticipation of future claims by plaintiff to workers' compensation benefits if plaintiff were to be injured on the job." The plaintiff in *Wilson* had been disabled from his employment in the course of activity apart from his employment with the defendant. *Id.* at 640. Accordingly, there is no indication from the *Wilson* opinion that the plaintiff in that case ever sought worker's compensation benefits in connection with his employment with the defendant. This Court held that "retaliatory discharge premised upon the employer's

anticipation of a future claim does not state a legally cognizable cause of action." *Id.* at 646.

Thus, *Griffey* and *Wilson* hold that an employee who has never filed a claim for worker's compensation benefits with regard to an employer does not have a cause of action under the WDCA for retaliatory discharge if that employer fires the employee on the basis of a belief that continued employment of the employee poses an above average risk of an injury covered by worker's compensation. However, this case is distinguishable from *Griffey* and *Wilson*. It is undisputed that Lamoria claimed and received worker's compensation benefits. We conclude that the discharge of an employee who is receiving worker's compensation benefits due to a particular on-the-job injury, if it is in retaliation for that employee having sought, in good faith, additional benefits based on the injury, constitutes a retaliatory discharge in violation of the WDCA. In such a circumstance, the fact that a person actually filed an initial worker's compensation claim under which the person began receiving benefits would be a direct causal factor in the decision to discharge the employee. Thus, it is immaterial whether the employee challenged the denial of the employee's request for further benefits.

LaVigne stated the following in her affidavit:

> Martin knew that Barbara Lamoria needed surgery to repair her knee and that she would be off work for a long period of time rehabilitating her knee. Martin did not want HCR to pay the cost of the surgery or rehabilitation.

Plaintiff stated in her deposition that she was informed by Sun Valley personnel that, in May 1994, Martin and Livy had taken over the handling of her worker's compensation claim. Viewing this evidence in a light most favorable to Lamoria, a record may be developed at trial to reasonably support a conclusion that Lamoria was discharged by defendants at least in part because she filed a claim for worker's compensation benefits. *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 435; 566 NW2d 661 (1997) (in reviewing a grant of summary disposition under MCR 2.116[C][10], this Court examines the entire record in a light most favorable to the nonmoving party to determine if a record could be developed that would leave open an issue on which reasonable minds could differ). Thus, the trial court erred in granting summary disposition to defendants on Lamoria's claim for retaliatory discharge under the WDCA.

## VI. CONCLUSION

We reverse the trial court's grant of summary disposition to defendants on Lamoria's claims that her discharge involved weight and age discrimination in violation of the state Civil Rights Act, that her discharge violated the HCRA, and that her discharge was in illegal retaliation for Lamoria's fil-

ing of a worker's compensation claim.[12] Because Lamoria has not challenged the trial court's grant of summary disposition with regard to the other claims she advanced below, we do not address those claims or disturb the trial court's grant of summary disposition to defendants with respect to those claims. Lamoria, being the prevailing party, may tax costs pursuant to MCR 7.219. We do not retain jurisdiction.

FITZGERALD, P.J. (*concurring*). I disagree with the majority's sentiments regarding the soundness of the decision in *Rymar v Michigan Bell Telephone Co*, 190 Mich App 504; 476 NW2d 451 (1991). I believe that *Rymar* was properly decided and that the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*, requires an employer to provide its employee a "reasonable time to heal" from a temporary injury before discharging an employee for an inability to perform a job, where the inability results from the injury.

---

[12] In light of our extensive discussion of evidence that may be considered to implicate defendants at trial, we emphasize that, in the context of reviewing a grant of summary disposition, we view the evidence and all reasonable inferences therefrom most favorably to the nonmoving party. See, e.g., *Paul, supra* at 210-211. In so examining the evidence, a court may not weigh credibility. *York v 50th Dist Court*, 212 Mich App 345, 349; 536 NW2d 891 (1995). Thus, our reversal of the trial court's grant of summary disposition should not be considered as an indication that Lamoria and her witnesses are (or are not) credible with regard to their various claims about the conduct of Martin and others.